IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Noel C. Gardner, | ) | OPINION |
| | ) | |
| Petitioner and Appellant, | ) | Case No. 20100520-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (December 28, 2012) |
| Mary E. Gardner, | ) | |
| | ) | 2012 UT App 374 |
| Respondent and Appellee. | ) | |

-----

Third District, Salt Lake Department, 914900261
The Honorable Paul G. Maughan

Attorneys:     Michael K. Mohrman, Tracy C. Schofield, and Mitchell S. Maio, Salt
               Lake City, for Appellant
               Kim M. Luhn and Paul H. Liapis, Salt Lake City, for Appellee

-----

Before Judges McHugh, Voros, and Roth.

ROTH, Judge:

¶1     Petitioner Noel C. Gardner (Husband) appeals the district court's denial of his petition to modify his divorce decree as well as its decision not to hold Respondent Mary E. Gardner (Wife) in contempt for violating a hold harmless provision within the divorce decree. We reverse and remand.

BACKGROUND

¶2      Husband and Wife married in 1984. Husband filed for divorce in 1991, and the final decree of divorce was entered in 1994. As part of the property division, Wife was awarded the marital home. At the time of the entry of the divorce decree, Husband and Wife were unable to refinance the mortgage, so the decree made Wife responsible for the mortgage debt and included a hold harmless provision, ordering Wife to "assume and pay and hold [Husband] harmless from . . . the . . . mortgage on the [marital] home."

¶3      Shortly after the divorce, apparently out of concern that Wife would not be timely in making the mortgage payments, Husband began making the monthly payments himself, deducting that amount from his monthly alimony obligation. Wife, however, moved the district court to order Husband to pay his full alimony obligation directly to her. The district court granted Wife's motion and "order[ed Husband] to pay the alimony . . . directly to [Wife], pursuant to the terms of the [divorce decree]" because "[Wife] . . . [is] obligated to pay the mortgage payment." Thereafter, Husband continued to pay his full alimony obligation to Wife and did not again pay the mortgage.

¶4      Over the next decade, Wife paid the mortgage without incident. Beginning at the end of 2007, however, Wife became chronically late in making her mortgage payments. From December 2007 to December 2009, 18 of 25 payments were untimely, being made after a grace period allowed under the promissory note, and at least 15 of those untimely payments incurred late fees.[1] Of those late payments, 8 were more than 30 days past due, the latest being 45, 58, 76, and 86 days late. The most untimely payments were made between June 2008 and January 2009. Specifically, the June 2008 payment was made on July 3, 32 days late; the July payment was made on August 15, 45 days late; the August payment was not made until October 16 and was 76 days late; the September and October payments were not made until November 26 and 28 and were 86 and 58 days late, respectively; the November payment was made on November 28, 27 days late; and the December payment was made on January 8, 38 days late. The

---

[1]The mortgage payment was due on the first of each month. However, the first fifteen days of each month were treated as a grace period and a late fee was not assessed unless the payment was made after that time.

20100520-CA                              2

January 2009 payment was made on January 12 and was the first payment in over a year that did not incur a late fee. Wife later explained that, during that time, she was unaware that she had missed her June 2008 payment, and as a result her July payment was credited towards the June payment, her August payment was credited towards her July payment, and so on until the January 2009 payment. According to Wife, this rolling arrearage resulted in all of her payments being past due until she managed to bring her payments current several months later.

¶5     During this same period, from October 2008 to January 2009, the credit limits on several lines of credit available to Husband were, according to him, substantially reduced or suspended entirely, resulting in a reduction of available credit from approximately $450,000 to $3,700, a decrease of over 99%. Husband's credit rating was also reduced by more than 100 points.

¶6     In December 2008, Husband filed a petition to modify the divorce decree, asserting that "there ha[d] been a substantial and material change in circumstances . . . which was not contemplated at the time the [divorce] decree was entered." Husband claimed that the changed circumstances included Wife's failure to make timely mortgage payments, which he alleged had resulted in substantial damage to his credit. Other changed circumstances alleged by Husband included a change in Husband's family circumstances as well as a change in Wife's economic status. Husband requested that the court modify the divorce decree to require that Wife "immediately refinance the home mortgage loan to secure the removal of [Husband's] name from the loan obligation" or to allow Husband to "be granted authority to sell the home." Husband requested attorney fees as well.

¶7     Husband also moved for an order to show cause, requesting that the district court hold Wife in contempt for violating the divorce decree's hold harmless provision by failing to make timely mortgage payments. As relief, Husband again requested either that Wife be ordered to refinance the mortgage or that he be permitted to sell the marital home. Husband also requested damages in the form of attorney fees as well as "additional damages caused by [Wife's] failure to comply with the court's order to hold [Husband] harmless on the mortgage debt."

¶8     The district court scheduled a trial in February 2010 to resolve both the order to show cause and Husband's petition to modify the divorce decree. On the morning of

trial, before the presentation of evidence, the court explained that it perceived "the central issue [to be] what it means to hold harmless" in the context of a divorce decree, which the court characterized as "a legal determination" that would "dramatically shape the way this case goes" and be dispositive of the issues before it. The court acknowledged that "there are no cases in Utah that define hold harmless," but it rejected Husband's offer that the parties submit memoranda on the issue based on case law from other jurisdictions. Instead, the court proceeded to "make a legal ruling on what it means . . . to hold harmless in a divorce proceeding."

¶9      The district court began its interpretation of the hold harmless provision by concluding that the type of harm and damages alleged by Husband due to Wife's failure to make timely mortgage payments were "extraordinarily speculative." These included "damages for the alleged reduction in [Husband's] credit rating, the alleged reduction in the credit limit on his credit cards, the alleged suspension of his home equity line of credit, the alleged loss of his ability to refinance his home, [and] for the attorney fees incurred in this matter." The court indicated that, because it considered those damages to be so conjectural, it interpreted the hold harmless provision only to "require[] [Wife] to hold [Husband] harmless from the payment of the first mortgage," meaning that Wife was only required to protect Husband from "damages actually suffered . . . for late payments, foreclosure costs, penalties, interest, and for monies paid by [Husband that] he was not obligated or planning to pay." The court reasoned that if Husband had been required to cover any such costs as a result of Wife's late payments, he could "pursue a remedy of contempt or a remedy of reimbursement for the then actually incurred damages that [he] would have incurred by his payment of the mortgage or the late fees." The district court found, however, that Wife "ha[d] corrected all late and delinquent payments," that "no foreclosure proceedings or [collection] actions [had been brought by the lender] against [Husband] or [Wife]," and that Husband "ha[d] not paid any monies for mortgage payments, late fees, foreclosure demands, penalties, or interest" on the mortgage. The court therefore concluded that Husband "ha[d] not been damaged in any manner" proscribed by the hold harmless provision and, thus, was not entitled to an award of damages. Accordingly, the district court concluded that "[Wife] ha[d] held [Husband] harmless" under the divorce decree's hold harmless provision and could not be held in contempt for violating the divorce decree.

¶10     The parties agreed that the district court's interpretation of the hold harmless provision disposed of the contempt issue, making it unnecessary to consider any of the evidence they had come prepared to present at trial. However, on Husband and Wife's motion, the district court admitted the parties' exhibits to complete the record for purposes of appeal.

¶11     Later that day, the parties realized that the court had made no decision concerning Husband's petition to modify the divorce decree. When this remaining issue was brought to the court's attention, it concluded that based on its interpretation of the hold harmless provision, Wife's late mortgage payments did "not constitute a material or substantial change in circumstances that would justify . . . revisiting" the divorce decree. The district court therefore denied Husband's petition to modify.

¶12     In support of its decision denying Husband's petition to modify and declining to hold Wife in contempt, the district court made several factual findings. In particular, the court found that Wife "failed to pay the June 2008 mortgage payment and it became a thirty (30) day rolling arrearage until it was paid in full in December 2008." The court further found "that [Wife] was occasionally late in [making the] monthly payments thereafter until November 2009 when all payments and fees were paid on the mortgage" and that "as of February . . . 2010, [Wife] has corrected all late and delinquent payments and that the mortgage is current." Husband objected to the accuracy of these factual findings, but the court denied Husband's objection.

¶13     Husband appeals the district court's decision that Wife could not be held in contempt for violating the divorce decree's hold harmless provision as well as its denial of his petition to modify the divorce decree. In appealing these decisions, Husband also challenges the court's underlying findings of fact.

ISSUES AND STANDARDS OF REVIEW

¶14     Husband first challenges the district court's decision that Wife should not be held in contempt for violating the hold harmless provision of the divorce decree. "The decision to hold a party in contempt of court rests within the sound discretion of the [district] court and will not be disturbed on appeal unless the . . . court's action is so unreasonable as to be classified as . . . a clear abuse of discretion." *Marsh v. Marsh*, 1999

UT App 14, ¶ 8, 973 P.2d 988 (citation and internal quotation marks omitted). In this case, the district court's decision was based on its interpretation of the decree's hold harmless provision. Interpretation of a divorce decree presents a question of law, which is reviewed for correctness. *See Mitchell v. Mitchell*, 2011 UT App 4, ¶ 5, 248 P.3d 65 (explaining that "[w]e interpret a divorce decree according to established rules of contract interpretation," and thus interpretation of a divorce decree presents a question of law that is reviewed for correctness (citation and internal quotation marks omitted)); *see also Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 2009 UT 27, ¶ 21, 207 P.3d 1235 ("We review a district court's interpretation of a written contract for correctness, granting no deference to the court below." (footnote citation omitted)).

¶15    Husband also challenges the district court's denial of his petition to modify the divorce decree on the basis that there had not been a substantial, material change in circumstances. "The determination to modify a divorce decree is generally reviewed under an abuse of discretion standard. However, questions about the legal accuracy of the [district] court's statements present issues of law, which we review for correctness." *Wall v. Wall*, 2007 UT App 61, ¶ 7, 157 P.3d 341 (citation and internal quotation marks omitted).

¶16    Finally, Husband challenges the factual findings made by the district court in support of its decisions declining to hold Wife in contempt and denying his petition to modify. "We review challenges to findings of fact for clear error. A [district] court's factual determinations are clearly erroneous only if they are in conflict with the clear weight of the evidence, or if this court has a definite and firm conviction that a mistake has been made." *Henshaw v. Henshaw*, 2012 UT App 56, ¶ 10, 271 P.3d 837 (mem.) (citations and internal quotation marks omitted).

ANALYSIS

I. The District Court Erred in Its Interpretation of the Divorce Decree's Hold Harmless Provision, and Its Contempt Decision Based on that Interpretation Is Therefore Erroneous.

¶17    The issue before the district court on the order to show cause was whether Wife should be held in contempt for violating the divorce decree's hold harmless provision,

which ordered Wife to "assume and pay and hold [Husband] harmless from . . . the . . . mortgage on the home." A decision on the order to show cause required the district court to interpret the hold harmless provision to determine the scope of its protection. The district court decided that the hold harmless provision required only that Wife protect Husband from making actual payments toward the mortgage and did not require her to make timely payments in order to protect him from other fiscal injury, such as damage to his credit. On appeal, Husband argues that the district court erroneously interpreted the hold harmless provision. We agree.[2]

A. Interpretation of the Hold Harmless Provision

¶18     As the district court noted, the scope of a hold harmless provision in a divorce decree, requiring one person to hold another harmless on a debt for which they are jointly responsible, has not been addressed under Utah law. In particular, the question of whether fiscal injury, such as damage to credit, is a type of harm that falls within the scope of a hold harmless provision is a matter of first impression. This issue has been addressed in other jurisdictions, however, and we find particularly useful the reasoning of the Tennessee Court of Appeals in *Long v. McAllister-Long*, 221 S.W.3d 1 (Tenn. Ct. App. 2006).

¶19     In *Long,* the divorce decree awarded the marital home to the husband and ordered him "to hold [the wife] harmless" from the parties' joint mortgage obligation, as well as from other debts on which they were jointly obligated. *Id.* at 6. Following the entry of the divorce decree, the husband failed to make timely payments on these obligations. *Id.* The wife sought to have the husband held in contempt for violating the decree's hold harmless provisions, arguing that his "repeated failure to make timely payments 'had a deleterious and harmful effect' on her credit and had damaged her credit standing." *Id.* On the husband's motion, the trial court dismissed the wife's

---

[2]In responding to Husband's position on appeal, Wife's argument, similar to the district court's reasoning, focuses on Husband's "extraordinarily speculative" damages, which, she asserts, justify the district court's interpretation of the hold harmless provision. However, interpretation of the hold harmless provision is a question of law that must be decided based on the plain language of the divorce decree. Nonetheless, we will address this aspect of the court's decision later in our analysis. *See infra* Section I.B.

contempt petition, reasoning that the hold harmless provision did not require the husband to make timely payments. *Id.* at 7.

¶20 The Tennessee Court of Appeals reversed. *Id.* at 14. The court reasoned that "a hold harmless agreement is nothing more or less than an indemnity agreement," the purpose of which is to "shift[] . . . the entire burden of liability from one person to another." *Id.* at 10. The court then identified two types of indemnity agreements, one providing "indemnity against loss" and the other providing "indemnity against liability." *Id.* at 11. The court explained that "[i]n the context of an agreement to indemnify against loss, the liability of the indemnitor does not accrue until the indemnitee has actually paid an obligation for which the indemnitee has been found liable" and "the indemnitor's liability [is limited] to the amount the indemnitee was actually required to pay." *Id.* An agreement to indemnify against liability, on the other hand, "requires the indemnitor to pay certain sums of money or to perform other acts that will *prevent* harm or loss to the indemnitee." *Id.* (emphasis added). In other words, in an agreement indemnifying against loss, "the indemnity is against the consequences of the event if it should happen," while in an agreement indemnifying against liability, the promise is that "the event shall not occur." *Id.*

¶21 The court in *Long* acknowledged that "[a] hold harmless agreement such as the one involved in this case . . . is generally classified as an indemnity against liability" agreement. *Id.* Nonetheless, the court looked to the language within the divorce decree itself to determine whether the hold harmless provisions were intended to indemnify against liability or against loss. *Id.* at 9, 11. The court concluded that the hold harmless provisions, which simply required the husband "to hold [the wife] harmless for the" mortgage and other debts, constituted an agreement to indemnify more broadly against liability rather than simply against loss. *Id.* at 6, 11–12. The court explained that "[t]he plain language of the agreement required [the husband] not only to pay these debts but also to hold [the wife] harmless should he fail to do so," and his obligation to hold the wife harmless from these debts "arose before the parties' creditors required [the wife] to pay the debts that had been assigned to" him. *Id.* at 12. Accordingly, the court concluded that the hold harmless provisions "required [the husband] to pay these debts in a timely manner in order to prevent [the wife] from being harmed," and the harm from which she was to be protected reasonably encompassed the "risk[ of] adverse effects on her credit rating." *Id.* The court then remanded the case to the district court to determine whether the husband should be held in contempt for violating the divorce

decree. *Id.* at 14. *See also Hawkins v. O'Brien*, No. M2008-02289-COA-R3-CV, 2009 WL 2058802 at *10–11 (Tenn. Ct. App. July 15, 2009) (explaining that, consistent with the decision in *Long*, the hold harmless "provision in the marital dissolution agreement requiring [the wife] to indemnify and hold [the husband] harmless clearly places the responsibility on [the wife] to timely pay the debt on the vehicle to avoid it going into default" and "[a]lthough [the husband] ha[d] not yet made any payments on the note, [the wife] violated the order by not making timely payments and allowing the note to go into default" (internal quotation marks omitted)).

¶22    Other courts have reached similar conclusions about the reach of hold harmless provisions in divorce decrees. For example, in *Eaton v. Grau*, 845 A.2d 707 (N.J. Super. Ct. App. Div. 2004), the divorce decree required the husband "to indemnify and hold the [w]ife harmless from any and all further obligations from ownership of the [marital home]." *Id.* at 709–11 (emphasis omitted) (internal quotation marks omitted). The husband failed to make timely mortgage payments, and the property fell into foreclosure. *Id.* at 710. The wife petitioned to enforce the divorce decree, alleging that the husband's failure to make timely payments damaged her credit and prevented her from qualifying for a mortgage on a new home. *See id.* at 710, 712. The court "read the obligation to 'hold harmless' in [the] case to protect against both [the wife's] liability to third parties and actual losses sustained by her to the extent she herself paid off some of the mortgage debt and thus had a right of subrogation against [the husband]." *Id.* at 712. Nonetheless, the court specifically recognized that "if the party who is supposed to make the monthly payment [on a joint debt] defaults, not only will the other party be responsible for the amount due, plus late charges, but his or her credit rating could be significantly damaged." *Id.* at 711. The court thus explained that "there may be other compensable fiscal injury encompassed by the 'hold harmless' clause at issue in this case, such as damage to [the wife's] credit rating or other harm related to her fiscal reputation," yet it declined to "define [the] outer parameters [of the hold harmless provision] because" on the record before it, the wife had "proven no such harm." *Id.* at 713; *see also id.* at 710, 713 (identifying several "other events" that could have "adversely affect[ed the wife's] credit," other than the husband's failure to pay the mortgage).

¶23    Similarly, in *Lemery v. Lemery*, No. FA0710962, 2001 WL 1160797 (Conn. Super. Aug. 27, 2001), the divorce decree required the wife to "pay the mortgage [on the marital home] and hold the [husband] harmless therefrom." *Id.* at *1. The wife was "late in making the mortgage payments on a substantial number of occasions," and the

husband's credit rating was damaged, though he had "suffered no monetary loss." *Id.* In the absence of Connecticut case law, the court looked to the legal definition of the phrase "hold harmless," which means "'to absolve (another party) from any responsibility for damage or other liability arising from the transaction,'" *id.* at *2 (quoting *Black's Law Dictionary* (7th ed. 1997)). Based on this definition, the court concluded that "the [husband] ha[d] been damaged by the [wife's] failure to pay the mortgage in a timely manner" and that she was therefore in contempt for violation of the hold harmless provision. *Id.* And in *Slavick v. Slavick*, No. FA980331705, 2002 WL 450948 (Conn. Super. Ct. Mar. 7, 2002), the divorce decree required the husband to "indemnify and hold the [wife] harmless regarding" several credit card debts. *Id.* at *1 (internal quotation marks omitted). The husband failed to make timely payments, and as a result the wife's checking account was garnished, she was assessed returned check fees, and she suffered damage to her credit rating. *Id.* at *1–2. The court reasoned "that if the [wife] can prove damage to her credit rating or other harm related to her fiscal reputation, it constitutes 'harm' from which the [husband] must protect her." *Id.* at *3. The court thus determined that the financial injuries suffered by the wife were "consequences[ that] by any interpretation[] constitute 'harm' caused . . . by the acts or omissions of the husband." *Id.* at *4. "For that reason, the court [found] . . . the [husband] . . . in contempt of the order of the court that he hold the [wife] harmless from [the] credit card debt." *Id. See also In re Marriage of Beals*, 149 Wash. App. 1016, No. 62151-3-I, 2009 WL 583396 at *2, 1 (Wash. Ct. App. Mar. 9, 2009) (per curiam) (concluding that "the commissioner did not extend or reduce any right or obligation beyond the scope originally intended" by the decree "[b]y ordering [the husband] to make timely payments of the mortgage" where the husband was required by the divorce decree to "hold the [w]ife harmless from all liability [from] . . . the . . . mortgage" but had "made nearly every payment late" and "as a direct result" the wife's "credit ha[d] been ruined" (internal quotation marks omitted)).

¶24    The hold harmless provision at issue in this case does not differ in any material respect from those interpreted in the cases we have just examined. *See generally Long v. McAllister-Long*, 221 S.W.3d 1, 10–12 (Tenn. Ct. App. 2006) (reasoning that "[a] hold harmless agreement . . . is generally classified as an indemnity against liability" agreement). As acknowledged in *Long*, a divorce decree is interpreted "according to established rules of contract interpretation" and its effect is determined by its plain language, *Mitchell v. Mitchell*, 2011 UT App 41, ¶ 5, 248 P.3d 65 (mem.) (citation and internal quotation marks omitted). *See also Long*, 221 S.W.3d at 9, 11. The hold harmless

provision in the Gardners' divorce decree orders Wife "to assume and pay and hold [Husband] harmless from . . . the . . . mortgage." As recognized in *Lemery*, to "hold harmless" means "[t]o absolve (another party) from any responsibility for damage or other liability arising from the transaction," *Black's Law Dictionary* 800 (9th ed. 2009). *See Lemery*, 2001 WL 1160797 at *2 (looking to the definition of "hold harmless" to interpret a hold harmless provision in a divorce decree). By requiring absolution from "*any* responsibility for damage or other liability," *Black's Law Dictionary* 800 (9th ed. 2009) (emphasis added), the definition of "hold harmless" indicates that Wife must "prevent harm or loss to" Husband regardless of whether he has "actually paid an obligation for which [Wife] has been found liable," *see Long*, 221 S.W.3d at 10–12. In addition, the hold harmless provision requires Wife to both "pay" the mortgage and to "hold [Husband] harmless" from the mortgage. Thus, Wife's obligation to hold Husband harmless plainly extends beyond simply making mortgage payments so that Husband does not become obligated to make the payments himself; it also requires Wife to fulfill the parties' joint obligations under the mortgage so as to prevent other fiscal injury that might foreseeably befall Husband, such as the kind of damage to his credit that could result from payments that are chronically late. *See id.* at 12 ("The plain language of the agreement required [the husband] not only to pay these debts but also to hold [the wife] harmless should he fail to do so." Accordingly, "his 'hold harmless' obligation arose before the parties' creditors required [the wife] to pay the debts that had been assigned to [the husband]."). Thus, based on the plain language of the decree, we conclude that the hold harmless provision here indemnifies against liability and not simply against loss.

¶25 In contrast, the district court interpreted the hold harmless provision to require that Wife hold Husband harmless only from making actual payments toward the mortgage. The court thus concluded that because Husband "ha[d] not paid any monies" toward the mortgage, "he ha[d] not been damaged in any manner" proscribed by the hold harmless provision. By interpreting the hold harmless provision in this way, the court essentially construed it as indemnifying Husband only against actual monetary loss. Further, the court ordered that if Wife "fails to make . . . payments . . . and if [Husband] determines that mortgage payments . . . have not been made[, he may make] . . . those payments *to protect himself*." (Emphasis added.) In effect, the court interpreted the hold harmless provision as a "hold yourself harmless" provision. The result of the court's interpretation is fundamentally inconsistent with the language of the provision

itself, which orders Wife to "assume and pay and hold [Husband] harmless from . . . the . . . mortgage on the home."

¶26    We conclude that the plain language of the hold harmless provision requires Wife to indemnify Husband not just against loss but also against liability. Thus, the hold harmless provision requires Wife not only to pay the mortgage but also to make timely payments so as to protect Husband from fiscal injury, such as damage to his credit. Such fiscal injury is therefore a cognizable harm that falls within the scope of the hold harmless provision here.

B. Extraordinarily Speculative Damages

¶27    The district court's interpretation of the hold harmless provision was based almost entirely on its assessment that Husband's damages were "extraordinarily speculative," i.e., that Husband could not assign a monetary value to or quantify the damage to his credit. The court's reasoning in this respect raises the question of whether Husband must prove quantifiable damages in order to prove that Wife violated the hold harmless provision, or whether it is sufficient for him to simply demonstrate that he suffered harm or injury as a result of Wife's failure to make timely mortgage payments to prove such a violation. Further, the issue of whether Wife has violated the hold harmless provision has been raised in the context of a contempt proceeding. Thus, the court's decision also raises the question of whether Husband must prove quantifiable damages in order for Wife to be held in contempt for violating the hold harmless provision. We will address each of these issues in turn.

¶28    As we have discussed, to "hold harmless" is to absolve another party from "damage or other liability." *Black's Law Dictionary* 800 (9th ed. 2009). This definition of "hold harmless" on which we have relied uses the term "damage" rather than "damages." *Id.* The words "damage" and "damages" are terms of art, each with a particular meaning. "Damage" is harm or "[l]oss or injury to a person or property,"[3] while "damages" are "[m]on[ies] claimed by, or ordered to be paid to, a person as compensation for loss or injury." *Id.* at 445. Because the definition of "hold harmless"

---

[3]Similarly, "harm" is defined as "[i]njury, loss, damage," and "material or tangible detriment," and "injury" is defined in relevant part as "[a]ny harm or damage." *Black's Law Dictionary* 784, 856 (9th ed. 2009).

uses the term "damage," meaning harm or "[l]oss or injury," *id.*, a violation of a hold harmless provision occurs if harm or injury is shown, without the necessity of quantifying that harm by assigning it a monetary value.

¶29    Such an interpretation is consistent with the notion that hold harmless provisions typically indemnify against liability, which "requires the indemnitor to pay certain sums of money or to perform other acts that will *prevent* harm or loss to the indemnitee," as opposed to indemnifying against loss, which requires the indemnitor to *compensate* the indemnitee for amounts actually paid and limits "the indemnitor's liability . . . to the amount the indemnitee was actually required to pay." *See Long v. McAllister-Long*, 221 S.W.3d 1, 11 (Tenn. Ct. App. 2006) (emphasis added). This conclusion is likewise consistent with the cases we have examined, which generally have recognized or expressed a willingness to recognize fiscal injury, such as damage to credit, as a harm that falls within the scope of a hold harmless provision, without requiring that such harm be quantified or even quantifiable. For example, in *Long*, the court concluded that the husband's obligation to hold the wife harmless from certain debts "required [him] to pay the[] debts in a timely manner in order to prevent [her] from being harmed." 221 S.W.3d at 12. The court noted that "[r]eceiving dunning letters and risking adverse effects on her credit rating are among the types of harm that entitled [the wife] to ask the trial court to enforce [the husband's] obligations to pay the debts the marital dissolution agreement required him to pay." *Id.*; *see also Hawkins v. O'Brien*, No. M2008-02289-COA-R3-CV, 2008 WL 2058802 at *10–11 (Tenn. Ct. App. July 15, 2009) (relying on *Long* to conclude that "the provision in the marital dissolution agreement requiring [the wife] to indemnify and hold [the husband] harmless clearly places the responsibility on [the wife] to timely pay the debt on the vehicle to avoid it going into default" and that "[a]lthough [the husband] had not yet made any payments, [the wife] violated the order by not making timely payments and allowing the note to go into default" (internal quotation marks omitted)). And in *Lemery v. Lemery*, No. FA0710962, 2001 WL 1160797 (Conn. Super. Ct. Aug. 27, 2001), the court concluded that the wife had violated the divorce decree's hold harmless provision by being repeatedly late in making the mortgage payments. *Id.* at *1–2. The court reasoned that even though the husband had "suffered no monetary loss" he "ha[d] been damaged by [her] failure to pay the mortgage in a timely manner" because his credit rating had been reduced significantly as a result. *Id. See also Eaton v. Grau*, 845 A.2d 707, 713 (N.J. Super. Ct. App. Div. 2004) ("[T]here may be other compensable fiscal injury encompassed by the 'hold harmless' clause at issue in this case, such as damage to [the wife's] credit rating or

other harm related to her fiscal reputation."); *Slavick v. Slavick*, No. FA980331705, 2002 WL 450948 at *3 (Conn. Super. Ct. Mar. 7, 2002) ("Although there is no law that specifically states what financial damage to a party is covered by a 'hold harmless' provision, generally, it is a compensable fiscal injury. . . . [I]f the plaintiff can prove damage to her credit rating or other harm related to her fiscal reputation, it constitutes 'harm' from which the defendant must protect her.").

¶30 Accordingly, because the hold harmless provision here protects Husband from "damage" rather than "damages" and indemnifies against liability and not just against loss, Husband need not quantify or assign a monetary value to the harm or injury he has suffered to prove that Wife violated the hold harmless provision by failing to make timely mortgage payments. Nonetheless, Husband must still prove that he suffered real injury or harm as a result of Wife's conduct, as opposed to a harm that is merely conjectural or speculative, though that harm need not be specifically quantifiable.

¶31 The issue of whether Wife violated the hold harmless provision in this case has arisen in the context of a contempt proceeding.[4] "[D]isobedience of any lawful judgment, order or process of the court" is a "contempt[] of the authority of the court." *See* Utah Code Ann. § 78B-6-301(5) (LexisNexis 2012). "To find contempt [for violation of a court order], the court must find . . . that the contemnor knew what was required, had the ability to comply, and willfully and knowingly failed and refused to do so." *Marsh v. Marsh*, 1999 UT App 14, ¶ 10, 973 P.2d 988 (citation and internal quotation marks omitted). Thus, a finding of contempt primarily requires a determination that a court order has been violated. By its nature, such a determination does not require a showing of harm or injury, quantifiable or not, because the core concern in a contempt proceeding is the challenge to judicial authority. *See* Utah Code Ann. § 78B-6-301 (describing "acts or omissions in respect to a court or its proceedings [that] are contempts of the authority of the court"). That does not mean that resulting harm or

_____

[4]Given the nature of disputes concerning the violation of a divorce decree, it is probably not surprising that many of the cases we have examined occurred in the context of contempt proceedings. *See generally Long v. McAllister-Long*, 221 S.W.3d 1, 9–12 (Tenn. Ct. App. 2006); *Slavick v. Slavick*, No. FA980331705, 2002 WL 450948 at *1–4 (Conn. Super. Ct. Mar. 7, 2002); *Lemery v. Lemery*, No. FA0710962, 2001 WL 1160797 at *1–2 (Conn. Super. Ct. Aug. 27, 2001); *Hawkins v. O'Brien*, No. M2008-00289-COA-R3-CV, 2009 WL 2058802 at *9–12 (Tenn. Ct. App. July 15, 2009).

injury is entirely irrelevant; instead, harm is a factor that the court may take into account in deciding whether contempt has occurred and in shaping an appropriate response rather than a prerequisite to determining that a party has disobeyed a court order. *See generally Utah Power & Light Co. v. Richmond Irrigation Co.*, 13 P.2d 320, 324 (Utah 1932) ("It . . . appears that there is no merit in the contention that the [district] court erred in failing to find loss or injury to the plaintiff, as a condition precedent to finding the defendants guilty of contempt."). And harm may be a particularly pertinent factor in the determination of whether actions, such as making late payments on a joint debt, amount to violation of an order that requires one party to hold the other harmless.

¶32     Once the court finds a person in contempt, it may then elect to impose an appropriate sanction. In this regard, the court may decide to compensate the person aggrieved by another's contemptuous conduct for the resulting loss. *See* Utah Code Ann. § 78B-6-311 (providing that a person aggrieved by contemptuous conduct may be awarded "a sum of money sufficient to indemnify . . . and to satisfy [that person's] costs and expenses"). Such a compensatory award for expenses incured may include an award of reasonable attorney fees. *See id.*; *Foreman v. Foreman*, 176 P.2d 144, 151 (Utah 1946). In addition, other sanctions may be imposed against the contemnor, such as payment of a fine or incarceration. *See* Utah Code Ann. § 78B-6-310. The decision of whether to impose a sanction, however, as well as the choice of sanction, is not mandatory but is left to the court's discretion. *Shipman v. Evans*, 2004 UT 44, ¶¶ 39–40, 100 P.3d 1151, *abrogated on other grounds by Utahns For Better Dental Health—Davis, Inc. v. Davis Cnty. Clerk*, 2007 UT 97, 175 P.3d 1036. *See also* Utah Code Ann. § 78B-6-310 ("If the court finds the person guilty of the contempt, the court *may* impose" one or a combination of sanctions. (emphasis added)); *id.* § 78B-6-311 (providing that the court "*may* order the person proceeded against" in a contempt proceeding to pay a compensatory award to a person aggrieved by the contemptuous conduct (emphasis added)).

¶33     In his motion to hold Wife in contempt for violating the divorce decree, Husband requested damages in the form of attorney fees as well as other "additional damages caused by her failure to comply with the court's order to hold [Husband] harmless on the mortgage debt." To the extent that Husband seeks monetary compensation for his fiscal injury, any award of damages must be based on something more than mere speculation. *See Pingue v. Pingue*, No. 95CAF02006, 1995 WL 768535 at *10 (Ohio Ct. App. Nov. 6, 1995) ("Though we agree the record clearly reflects the credit standing of

[the wife] was damaged by [the husband's] failure to perform his obligations under the [divorce decree], the amount of damages resulting therefrom was purely speculative."); *Hawkins*, 2009 WL 2058802 at *11–12 (concluding that although the wife violated the hold harmless provision in the divorce decree when she failed to make timely payments on the vehicle and allowed the note to go into default, the court erred in simply awarding the husband the $10,000 balance on the note because he had not actually had to pay any of the debt). But here a monetary award that simply quantifies the value of the damage to his credit is not the only remedy Husband seeks. For example, Husband has requested an award of attorney fees. Although it may be difficult to quantify the damage to his credit, it would not be difficult to determine the amount of attorney fees Husband has incurred due to Wife's violation of the hold harmless provision. In addition, Husband has requested other remedies, such as refinance or sale of the house, which are designed to avoid the potential for late payments altogether. The determination of whether remedies like these are appropriate under the circumstances seems largely independent of Husband's ability or inability to assign a monetary value to the injury to his credit.

¶34    In summary, we conclude that the hold harmless provision requires Wife to indemnify Husband against liability and not simply against loss. Thus, the hold harmless provision requires Wife to make timely mortgage payments to prevent fiscal injury to Husband, such as damage to his credit. Under the circumstances of this case, in order to prove that Wife violated the hold harmless provision, Husband must show that Wife's failure to make timely mortgage payments has caused him real harm or injury. Proof of such harm or injury is sufficient to show that Wife violated the hold harmless provision, which may in turn be a sufficient basis for Wife to be held in contempt of court. Husband need not quantify that harm, either for the purpose of showing that Wife violated the hold harmless provision or for the purpose of showing that Wife acted in contempt of court. But the court may certainly consider the quality of the evidence presented by Husband to determine whether Wife's untimely payments amount to contempt and, if so, to determine the appropriate remedy.

¶35    Although we have concluded that fiscal injury, such as damage to credit, is a harm or injury that may fall within the scope of a hold harmless provision and need not be quantifiable, Husband must nonetheless prove causation, i.e., that Wife's failure to make timely mortgage payments caused his fiscal injury. *See, e.g., Eaton v. Grau*, 845 A.2d 707, 713 (N.J. Super. Ct. App. Div. 2004). Thus, to prove that Wife violated the

hold harmless provision, Husband must show that the damage to his credit was caused by Wife's failure to make timely mortgage payments. The opportunity to prove such causation is the precise relief sought by Husband. He anticipates that Wife will "argue that her failure to pay the mortgage timely had not been the cause of [his] losses," and he seeks the opportunity to present evidence to the district court to prove that the damage to his credit was caused by Wife's untimely payments. In ruling as it did, the district court denied the parties the opportunity to adjudicate this issue on the merits. We accordingly remand for that purpose.

¶36    If on remand the district court determines that Wife violated the hold harmless provision, it must next determine whether Wife should be held in contempt. *See generally Marsh v. Marsh*, 1999 UT App 14, ¶ 10, 973 P.2d 988 ("To find contempt, the court must find from clear and convincing proof that the contemnor knew what was required, had the ability to comply, and willfully and knowingly failed and refused to do so." (citations and internal quotation marks omitted)). If the district court decides to hold Wife in contempt for violating the divorce decree's hold harmless provision, it may then determine an appropriate sanction or remedy.

## II. The District Court Abused Its Discretion in Denying Husband's Petition To Modify the Divorce Decree.

¶37    Husband next argues that the district court erred in denying his petition to modify the divorce decree on the basis that there had not been a substantial, material change in circumstances. Based on its interpretation of the hold harmless provision, the court concluded that Wife's failure to make timely mortgage payments did "not constitute a material or substantial change of circumstances that would justify the [c]ourt in revisiting the provisions of the" divorce decree. We have concluded, however, that the court erred in its interpretation of the hold harmless provision. Because the court's denial of Husband's petition to modify was based solely on its erroneous interpretation of the hold harmless provision, the court must reconsider this issue on remand.

¶38    In addition, a determination of whether Wife violated the hold harmless provision is not by itself dispositive of Husband's petition to modify. "On a petition for a modification of a divorce decree, the threshold requirement for relief is a showing of a substantial change of circumstances occurring since the entry of the decree and not

contemplated in the decree itself." *Wall v. Wall*, 2007 UT App 61, ¶ 11, 157 P.3d 341 (citation and internal quotation marks omitted). "If a change in circumstances is reasonably contemplated at the time of divorce[, then it] is not legally cognizable as a substantial change in circumstances . . . ." *Id.* (alteration in original) (citation and internal quotation marks omitted). "[A] material change in circumstances [is] contemplated in a divorce decree [if] there . . . [is] evidence, preferably in the form of a provision within the decree itself, that the [district] court anticipated the specific change." *Id.* ¶ 12 (citation and internal quotation marks omitted).

¶39    Here, the primary issue presented by the petition to modify is whether Wife's failure to make timely mortgage payments constitutes a substantial and material change in circumstances that was not contemplated by the divorce decree. Although the proper interpretation of the divorce decree's hold harmless provision and a determination as to whether Wife's failure to make timely mortgage payments violated that provision are certainly relevant to Husband's petition to modify, those issues do not fully resolve the issue of whether Wife's failure to make timely mortgage payments was contemplated by the divorce decree and whether that conduct is a substantial and material change.

¶40    In addition, Husband's petition to modify is not confined to the issue of whether Wife violated the hold harmless provision but also alleges other changed circumstances as a basis for relief, such as the increased complexities of his current family situation and Wife's improved economic status. Because the district court relied entirely on its interpretation of the hold harmless provision as its basis for denying Husband's petition to modify, these matters were left unaddressed.

¶41    Thus, for these reasons, the district court's reliance on the hold harmless provision as the sole basis for denying Husband's petition to modify was error. Accordingly, we reverse the district court's denial of Husband's petition to modify and remand for further consideration of the petition consistent with this decision.

### III. The District Court's Factual Findings Are Clearly Erroneous.

¶42    As a final matter, in denying Husband's petition to modify and declining to hold Wife in contempt for violating the divorce decree's hold harmless provision, the district court made a few factual findings that Husband challenges on appeal, arguing that those findings are clearly erroneous. The district court purported to resolve the

contempt and modification issues as a matter of law but nonetheless made the challenged factual findings, likely as background for its legal ruling. However, as a result of our decision here, the issues raised by the contempt proceeding and Husband's petition to modify cannot be resolved simply as a matter of law. Thus, these factual issues will be relevant to the decisions the district court must make on remand, and for that reason we address the findings here. *See State v. Low*, 2008 UT 58, ¶ 61, 192 P.3d 867 (explaining that appellate courts have discretion to address issues that may arise on remand).

¶43    Before we review the district court's factual findings, however, we emphasize that our review is limited to pointing out inconsistencies between the court's findings and the evidence available to us in the record. By highlighting these inconsistencies, we do not intend to make substitute factual findings. Indeed, "[t]he appellate court is entrusted with ensuring legal accuracy and uniformity and should defer to the [district] court on factual matters." *Willey v. Willey*, 951 P.2d 226, 230–31 (Utah 1997). So if this court determines that the district court's factual findings are insufficient or clearly erroneous, "[i]t is inappropriate in most instances for . . . [the] court to disregard the [district] court's findings of fact . . . and to assume the task of weighing evidence and making its own findings of fact." *Id.* at 230. Rather, this court should "normally remand[] the matter to the [district court] . . . . to make . . . [additional or] new findings because of its unique position to weigh the evidence." *Id.* (citation omitted).

¶44    It appears that the evidence in the record was reviewed by the district court to some limited extent. But as we have discussed, the court purported to make its decisions to dismiss the petition to modify and decline to hold Wife in contempt as a matter of law, based on its interpretation of the hold harmless provision. As a result, the court did not receive evidence and seems to have treated the factual circumstances simply as a background to its legal determination. In fact, the bulk of the evidence in the record on these issues was simply admitted for purpose of this appeal and, as a consequence, has yet to be scrutinized or evaluated in an evidentiary hearing or trial. It is therefore particularly important that our evaluation of the evidence in the record should not be binding on remand. Rather, on remand the district court must consider the facts anew, which will necessarily require the parties to present the evidence they were prepared to present on the day of trial, and the district court must be free to consider all the relevant evidence and make appropriate factual findings. Having

established the limited scope and effect of our analysis, we turn to our review of the district court's factual findings.

¶45    The district court found that Wife "failed to pay the June 2008 mortgage payment and it became a thirty (30) day rolling arrearage until it was paid in full in December 2008." The court further found "that [Wife] was occasionally late in monthly payments thereafter until November 2009 when all payments and fees were paid on the mortgage" and "as of February . . . 2010, [Wife] has corrected all late and delinquent payments and that the mortgage is current."

¶46    In finding that Wife inadvertently failed to pay her June 2008 mortgage payment, which resulted in a 30 day rolling arrearage, the court in effect determined that Wife had only missed one payment and that the following late payments between June 2008 and December 2008 were only late as a result of that single missed payment, which caused Wife to be continuously one payment behind. The trial court also in effect determined that Wife's payments during that time period would otherwise have been timely if those payments had been credited for the month in which they were made. However, the evidence in the record of Wife's payment history shows that the trial court's reasoning only applies to the June and July payments: the missed June payment was made on July 3, and would have avoided a late fee if credited as the July payment, yet it was 32 days late for the June payment; the July payment was made on August 15, which would have avoided a late fee as the August payment, yet it was 45 days late for the July payment. The August payment, however, was not made in September, which would have been the case if Wife were simply a month behind in her payments due to the missed June payment. Rather, Wife's next payment was made on October 16, so if considered to be the August payment it was 76 days late, and even if intended as the September payment, it would have been over 30 days late. Similarly, the September payment was not made until November 26, and the October payment was not made until November 28; these payments were 86 and 58 days past due, respectively. Thus, even if Wife intended those payments to be for October and November, they would have been just shy of or over 30 days late. The November 2008 payment was actually made on November 28, essentially resolving the rolling arrearage caused by the missed June payment; but that payment was itself 27 days late. The December payment was made on January 8, 38 days late. The January payment itself was made on January 12, and it was the first payment in over a year that was made without incurring a late fee.

¶47 Thus, contrary to the district court's factual findings, Wife did not bring her mortgage payments current until January 2009, not December 2008. Also, it appears that Wife resolved the rolling arrearage in November 2008 rather than in December 2008. Having resolved the rolling arrearage in November, Wife's late payments in November and December were no longer attributable to the rolling arrearage but were simply late. Further, even accounting for the 30 day rolling arrearage that resulted from the missed June payment, the August, September, and October payments were each made late enough to be more than or just shy of 30 days past due. Thus, Wife's failure to make timely mortgage payments from June 2008 to December 2008 is not attributable simply to a rolling arrearage.

¶48 The district court further found "that [Wife] was occasionally late in monthly payments [from December 2008] until November 2009 when all payments and fees were paid on the mortgage" and "as of February . . . 2010, [Wife] has corrected all late and delinquent payments and . . . the mortgage is current." At the time of trial, the parties agreed that Wife had brought her mortgage payments current as of February 2010. It is also true that throughout 2009 Wife was more timely in making her mortgage payments than she had been throughout 2008. But nonetheless, in 2009, five payments were past due, three of those being 35, 28, and 38 days past due. Thus, more than a third of Wife's payments in 2009 were past due, and most of those were over or just shy of 30 days past due. While the district court's description of Wife's mortgage payments during 2009 as being "occasionally late" is not entirely untrue as a general statement, it perhaps unduly minimizes the significance of the number and nature of the late payments. In addition, Wife did not bring her mortgage payments current by November 2009, as the court concluded; rather, the November 2009 payment was made 38 days late in December, and the December payment was also late. Thus, it appears that the mortgage payments were not brought current again until February 2010.

¶49 Overall, our review of the evidence available in the record indicates that the district court's factual findings do not accurately characterize Wife's 2008 and 2009 payment history because those findings fail to recognize that for two years most of Wife's mortgage payments were late, even significantly late. Indeed, from December 2007 to December 2009, 18 of 25 payments were untimely and made far enough past due to incur a late fee, and of those late payments, 8 were more than 30 days past due, with one being over 60 days late, and another nearly 90 days past due.

¶50 Wife does not attempt to defend the accuracy of these findings but instead argues that any errors are harmless. According to Wife, the district court emphasized that the untimely and delinquent payments had been resolved by the day of trial and that no foreclosure proceedings had been initiated against Wife or Husband. She thus argues that "[i]t was clearly important to the [district] court that the problem had been fixed and that [Husband] did not have to pay out any monies as a result of the delinquencies, however many there were." Wife also argues that Husband's damages "are too speculative" to substantiate contempt proceedings and are also "clearly insufficient to establish a material and substantial change of circumstances" so as to justify modification of the divorce decree, which she suggests makes the accuracy of the court's findings irrelevant. However, Wife's position relies on the correctness of the district court's interpretation of the hold harmless provision. We have concluded that the court erred in its interpretation, and therefore Wife's argument is left without its foundation. Further, based on our review of the evidence available in the record, the district court's factual findings fail to accurately express the full extent of Wife's failure to make timely mortgage payments, which in turn may have obscured and unduly minimized the damage that may have been done to Husband's credit. The extent of Wife's failure to make timely mortgage payments and the extent of the harm caused to Husband are material to the issues the district court will consider on remand. Thus, we disagree with Wife's position that the errors in the district court's factual findings are harmless. We therefore conclude that the district court's factual findings are inconsistent with the evidence in the record before us and should be reconsidered in light of all the pertinent evidence presented on remand.

CONCLUSION

¶51 We conclude that the district court erroneously interpreted the divorce decree's hold harmless provision and, consequently, erred in deciding that Wife could not be held in contempt for violating the divorce decree. We further conclude that the district court abused its discretion in denying Husband's petition to modify the divorce decree because its decision was also based on its erroneous interpretation of the hold harmless provision. Finally, we conclude that the district court's factual findings are inconsistent with the information available in the record. Thus, the district court must consider the facts anew to make factual findings on remand consistent with all the evidence presented.

¶52     Accordingly, we reverse and remand for proceedings consistent with this opinion.

_____
Stephen L. Roth, Judge

-----

¶53     WE CONCUR:

_____
Carolyn B. McHugh, Judge

_____
J. Frederic Voros Jr., Judge