2019 UT App 147

## THE UTAH COURT OF APPEALS

MELVIN C. MCQUARRIE,
Appellant and Cross-appellee,

*v.*

JANETTE COLLEDGE MCQUARRIE,
Appellee and Cross-appellant.

Opinion
No. 20170956-CA
Filed August 29, 2019

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 084904419

James A. McIntyre and Richard R. Golden, Attorneys
for Appellant and Cross-appellee

Douglas B. Thayer, Andrew V. Wright, and Cole L.
Bingham, Attorneys for Appellee and
Cross-appellant

JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DAVID N.
MORTENSEN concurred.

APPLEBY, Judge:

¶1     Melvin C. McQuarrie appeals the district court's order dismissing his counter-petition to modify a divorce decree (Decree). He argues the court erred in determining that his alimony obligation did not terminate when Janette Colledge McQuarrie remarried. Janette[1] cross-appeals, arguing the court

---

1. As is our practice when the parties have the same last name, we refer to them by their first names with no disrespect intended by the apparent informality.

erred in calculating her attorney fees award and in denying portions of her motion for an order to show cause why Melvin should not be held in contempt of court (Show Cause Motion). We affirm the district court's determination that Melvin's alimony obligation continued after Janette's remarriage. We conclude the court abused its discretion in denying portions of the Show Cause Motion but not in calculating Janette's attorney fees award. We therefore affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

BACKGROUND

¶2    Janette and Melvin divorced in 2008, and a Decree was entered pursuant to a mediated stipulation for divorce. The Decree named Janette primary caregiver to the parties' minor child and ordered Melvin to pay $3,000 per month in child support until the child reached "the age of 26 or so long as [the child remained] a college student, whichever occur[red] later." A child support obligation worksheet was attached to the stipulation. In that worksheet, the parties acknowledged that Janette's child support award was greater than the amount set by the statutory guidelines and indicated that the reason for the upward deviation was the parties' "property settlement."

¶3    The Decree ordered Melvin to pay "$2,000.00 per month as alimony with a cost of living increase up to 3% per annum" while child support continued. After child support terminated, alimony would be "adjusted pursuant to the sum set forth in 'Exhibit C' to the [parties' stipulation], with a cost of living increase of up to 3% per annum." Exhibit C is a spreadsheet that appears to summarize the payments and assets Janette would receive under the stipulation. It lists yearly payments from 2008 to 2039 (372 months) in each of the following categories: (1) Alimony and Child Support, (2) Taxes on

Alimony, (3) Health Insurance, (4) Car Allowance, (5) Utilities and Property Taxes, and (6) House Maintenance. Exhibit C also provides sums labeled "House Value," "New Furniture," and "Personal Assets," as well as a sum labeled "Total Net Present Value." The alimony and child support category provides for a $5,000 payment in 2008, and the payment increases each year until the final payment of $12,500.40 in 2039. The Decree states that alimony will continue "until the first of any of the following occurrences: [Melvin's] death; [t]he expiration of 372 months from the signing of the [Decree]; or [Janette's] death."

¶4   The Decree ordered Melvin to purchase a $1,000,000 annuity for Janette within "[t]hirty-six months after the signing of the [Decree]." Janette was "to be irrevocably designated as the beneficiary of the annuity during her lifetime with the power to designate any blood relative as the beneficiary of any death benefit provided by the annuity" and was to dictate a "payout duration in excess of fifteen years." The Decree said it was "anticipated that the annuity [would] provide a stream of income to [Janette] for her lifetime sufficient to supplement what [Melvin] pays as alimony." In a footnote, the Decree ordered Janette and Melvin to meet every three years "at the Hyatt Regency, or comparable hotel, in San Diego, California" "without spouses or attorneys" "to review their respective standard of living." To maintain an "equal" standard of living, the footnote also permitted "an upward adjust[ment] of alimony . . . , but never a downward adjustment."

¶5   Next, the Decree "divided and awarded" the parties' property and their "marital debts and obligations." Janette was awarded the parties' marital house. The Decree ordered Melvin to pay various expenses related to the house, and those payments were listed in sub-paragraphs 18(a)–(g). Sub-paragraph 18(a) ordered Melvin "to satisfy the monthly payments owing on the first deed of trust," and sub-paragraphs 18(b)–(g) ordered him to, among other things, pay the "real

property taxes and homeowner's insurance" until the first deed of trust was satisfied. But paragraph 21 provides, "Upon [Melvin's] purchase of the annuity . . . [his] responsibility for the payments outlined in paragraph 18(b)–(g) is ordered to cease and [his] obligation with respect to those items will be at an end." The Decree states that "[Melvin's] payment of the first deed of trust, the real property taxes, and the homeowner's insurance constitutes a part of the property settlement." Janette also received an award of "one-half of [Melvin's] 401(k) retirement benefits accrued during the parties' marriage."

¶6      As "part of the property settlement agreed upon by the parties," the Decree ordered Melvin to permanently "employ [Janette] with one of his companies" and, as a benefit of that employment, the company was required to "pay for [Janette's] health insurance premiums for as long as [she] require[d] medical insurance." The Decree also ordered Melvin to "maintain medical insurance for the medical expenses of the [parties'] minor child" and to "pay for the minor child's out-of-pocket costs" and "uninsured medical expenses." The Decree ordered that if Janette incurred "medical expenses on behalf of the minor child," she was to either "provide written verification of the cost and payment of the medical expenses she paid on the minor child's behalf" to Melvin or make arrangements "so that [Melvin] may be billed directly." Following the provisions dealing with medical insurance, the Decree states that "[t]he payment of [Janette's] health insurance premiums and uncovered medical expenses constitute a portion of the property settlement."

¶7      Many of the Decree's provisions mention Janette's potential remarriage, and the Decree provides that certain obligations will terminate if she remarries. For example, sub-paragraph 7(a) states that Melvin "shall not be responsible for any medical premium, prescription, out of pocket, or co-pay expense related to [Janette's] *future spouse, or spouse's children*."

(Emphasis added.) Paragraph 11 allows Janette "to designate any blood relative as the beneficiary of any death benefit provided by the annuity," but "*in the event she remarries*, she may not designate her spouse or his children as beneficiaries." (Emphasis added.) Paragraph 28 provides, "*In the event* [*Janette was*] *unmarried*, commencing in 2011, and every five years thereafter so long as [Janette] remain[ed] single, [Melvin was] ordered to purchase or lease for [her] . . . a model year 2012 Cadillac Escalade, or equivalent." (Emphasis added.) Under paragraph 19, "*should* [*Janette*] *remarry*," Melvin shall "continue to pay the first deed of trust until it is paid in full" but he will be "relieved of any and all obligations to pay and maintain the items in . . . sub-paragraphs 18(b)–(g)." (Emphasis added.) Finally, paragraph 29 provides that the parties cannot divest assets to a future spouse, and paragraph 30 prohibits the disclosure of any settlement or of the terms of the Decree to future spouses. The Decree does not contain a separate provision addressing whether Melvin's alimony obligation would terminate or continue if Janette remarried.

¶8     Janette remarried in 2014. That year, she filed a petition to modify the Decree (Petition to Modify) based on Melvin's alleged fraud. She claimed Melvin did not disclose certain assets and "misrepresented the value of the marital home . . . for purposes of inducing her to enter into the property settlement." Janette also filed the Show Cause Motion, asserting Melvin should be held in contempt of court for, among other things, failing to pay a cost of living increase on the alimony award, Janette's "uncovered" and "out-of-pocket medical expenses," and "one-half of [his] 401(k)," and for failing to purchase the $1,000,000 annuity.

¶9     Melvin     filed     a     counter-petition     to     modify (Counter-petition). He asserted Janette's remarriage constituted "a substantial and material change in the parties' circumstances" that justified terminating his alimony obligation. Specifically, he argued that alimony terminated as a matter of law upon Janette's

remarriage because the Decree did not "specifically provide otherwise." *See* Utah Code Ann. § 30-3-5(9) (LexisNexis Supp. 2018) ("Unless a decree of divorce specifically provides otherwise, any order of the court that a party pay alimony to a former spouse automatically terminates upon the remarriage or death of that former spouse.").

¶10 After a hearing, a court commissioner entered a recommendation on the Petition to Modify, the Show Cause Motion, and the Counter-petition. To start, the commissioner recommended denying Melvin's request to terminate alimony. The commissioner reasoned, "[A]lthough the decree does not state alimony will not terminate upon remarriage, the Decree is clear on its face considering all the other references to remarriage in the other provisions . . . that the parties intended for alimony to survive remarriage."

¶11 Next, the commissioner addressed the Show Cause Motion, beginning with the cost of living adjustment to alimony. First, the commissioner concluded that the alimony provisions established "a cost of living increase of up to 3% per annum (and never downward)," but that the actual increase was "to be determined by the Consumer Price Index [(CPI)]." Second, the commissioner concluded "the Decree does not require [Melvin] to pay for [Janette's] out of pocket medical costs." Third, the commissioner found "the payment of half of [Melvin's] 401(k) account ha[d] been satisfied . . . by [Melvin's] payment to [Janette] in the amount of $8,885.52." Fourth, because Melvin did not purchase the annuity within thirty-six months of the entry of the Decree, the commissioner recommended that Janette receive "a judgment in an amount sufficient to compensate her for the loss of the stream of income, past and future, from the ordered annuity." But if Melvin purchased "an annuity which pa[id] $6,728.63 per month for 140 months," the commissioner concluded "his purchase of the annuity [would] satisfy the judgment entered against him." The commissioner also concluded that Melvin should receive "credit against the annuity

judgment for payments he made . . . (that [Janette] would have otherwise been paying herself out of the stream of income from the annuity) . . . past the date that the annuity should have been purchased."

¶12   Janette filed an objection to the commissioner's recommendation. First, she claimed the cost of living adjustment to alimony should "be a straight 3% each year," regardless of the CPI. Second, she asserted Melvin should not receive credits against his annuity obligation for payments listed in sub-paragraphs 18(b)–(g) of the Decree because those payments "were to continue *until* [he] purchased the annuity—which he did not do." She objected to the recommended amount for Melvin's annuity obligation, claiming the written recommendation differed from what the commissioner orally recommended at the hearing. Third, she argued that Melvin had not paid her half the value of his 401(k) account. Fourth, she asserted Melvin should pay her out-of-pocket medical expenses because "the Decree clearly states that [Melvin's] payment of [Janette's] health insurance premiums and uncovered medical expenses constitute a portion of the property settlement."

¶13   After a period of discovery, Janette filed a motion to limit issues for trial. While that motion was pending, Melvin filed a motion for partial summary judgment on his claim that alimony terminated as a matter of law when Janette remarried because the Decree did not "specifically provide otherwise." The court scheduled a hearing on the motion to limit issues for trial, and the court commissioner scheduled a hearing on the motion for partial summary judgment.

¶14   At the hearing on the motion to limit issues for trial, the district court told the parties it wanted to "simply have a discussion" about the case. It explained that the parties' stipulation that "made the basis of the [Decree was] going to be followed" and the only issue worth pursuing in the case was

"the possibility of the allegation of fraud." The court determined that alimony did not terminate upon Janette's remarriage because the Decree "could be fairly read and interpreted that the parties either negotiated away—or clearly understood . . . what those alimony provisions were." And "[e]ven though they may have been characterized as . . . alimony, when you look at the way they were treated, . . . it clearly looks to be . . . that it was a—in a way, a property settlement agreement." The court also said "you could interpret [the Decree] to read the parties specified, clearly, the terms of—as it relates to the alimony and waived, knowingly, the statutory benefit that they would have had on the issue of remarriage."

¶15    The court also expressed skepticism toward the merits of the Petition to Modify. It said, "I don't have any indications of all the facts or the evidence, but I don't see any fraud here. Okay? There was negotiation and understanding with respect to what the settlement agreement was." But "[i]f there really was two or three items left out of this property agreement," the court explained, "whether they were left out intentionally, on purpose, [or] negligently, . . . fairness and equity would clearly require that they be looked at." Janette responded that she was "willing to waive that claim altogether" and then said, "that leaves us—there's nothing else to decide . . . other than the issue of fees."

¶16    Melvin informed the court that a summary judgment motion on "the issue of remarriage and the fact that the [Decree] does not specifically provide that alimony doesn't terminate upon remarriage . . . [was] before the commissioner [the following] week." After acknowledging the commissioner's order determining that alimony did not terminate upon remarriage—which was signed by the district court—Melvin said he would "like to have [the commissioner] have the opportunity to make a recommendation" with "the benefit of the [new] briefing that's involved . . . [and] there are several more recent Utah Court of Appeals and Supreme Court cases that bear

on the issue." The court responded, "If you want to try to get a second bite at the apple and convince [the commissioner], that's fine."

¶17   But the court concluded that it was "ready to issue an order of dismissal"[2] and saw no "need to set trial," and turned to address Janette's request for attorney fees. The court determined she was entitled to fees "that relate to the enforcement in the first place and the requirement for [Melvin] to give the annuity and to comply with the other terms and provisions" of the Decree. Specifically, the court found that Janette was the prevailing party on the Show Cause Motion, explaining that "the hearings brought up such quick decisions . . . [b]ecause [Melvin] was not in compliance with the [Decree]." But the court said it would view other fees "with some skepticism" because both parties "lost on [their petitions to modify] with respect to not being able to prove a substantial material change in circumstances."

¶18   Although the district court dismissed the case, the court commissioner nevertheless held a hearing on Melvin's motion for partial summary judgment and recommended that the motion be denied. Melvin filed an objection to the commissioner's recommendation, asserting again that Utah Code section 30-3-5(9) required termination of his alimony obligation. The court rejected Melvin's objection to the recommendation and entered an order denying his motion for summary judgment.

---

2. We are puzzled by this "dismissal." What began as a pre-trial hearing appears to have resulted in the court's dismissal of both petitions to modify. In Janette's case, this appears to have been because she waived the basis for the Petition to Modify at the hearing on the motion to limit issues; in Melvin's case, the dismissal ruling was made even though a motion for partial summary judgment was still pending.

¶19 The court then entered an order memorializing its verbal dismissal of the Petition to Modify and the Counter-petition. It found "that the Stipulation and Decree between the parties [would] be followed as written." And after reviewing "all the language in the Decree," it concluded the alimony provisions "were not something that would be terminated or eliminated based upon the remarriage of [Janette]." That is, it found "that the Decree language specifically provides that the alimony/child support payments would continue beyond remarriage and were structured to provide the appropriate division of the marital assets to [Janette]." The order also stated the court would "award [Janette's] attorney's fees regarding her attempts to enforce the Decree's terms" and requested that Janette "submit the required affidavit on [her] attorney's fees."

¶20 After the petitions had been dismissed, Janette filed a request to submit for decision her objection to the commissioner's recommendation on the Show Cause Motion. The court denied Janette's objection. It explained, "[T]he recommendation signed by the commissioner and the court is the order that will be complied with by the parties as the court has not found the commissioner erred as a matter of law and the court independently agrees with the decision made by the commissioner."

¶21 Janette submitted an attorney fees declaration that claimed she incurred $302,602 in attorney fees throughout the case with $275,659 "incurred in [her] efforts to enforce the terms of the [Decree]" and $61,448 relating "to the prosecution of [the Show Cause Motion]." Janette then filed a proposed order with an award of $275,659 in attorney fees. The court responded with a notice titled "Not Signed Order (Proposed) Awarding Attorney Fees and Costs." The notice stated that "the only fees that [would] be awarded [were] those the court already so stated for the [Show Cause Motion]." Janette then filed a second proposed order with an award of $61,448 in attorney fees. Again, the court refused to sign the proposed order and noted, "These

fees are not reasonable for an [order to show cause] hearing before the commissioner and then the court.[3] The court will issue a ruling on the amount to be awarded."

¶22   The court entered an order awarding Janette $9,480 in attorney fees. The order provided, "While both parties prevailed on some issues and were less successful on others, [Janette] was the prevailing party in relation to the prosecution of [the Show Cause Motion]." And "having conducted a review of the entries attached to the [attorney fees affidavit]," the court concluded that $9,480 "incurred in fees was reasonable and necessary in relation to the prosecution of the [Show Cause Motion]."

¶23   Melvin appeals; Janette cross-appeals.

ISSUES AND STANDARDS OF REVIEW

¶24   Melvin argues the district court erred in determining that his alimony obligation survived Janette's remarriage. This issue requires us to review the court's interpretation of the Decree as well as its interpretation and application of Utah Code section 30-3-5(9). "Interpretation of a divorce decree presents a question of law, which is reviewed for correctness." *Gardner v. Gardner*, 2012 UT App 374, ¶ 14, 294 P.3d 600. "The proper interpretation and application of a statute is [also] a question of law which we review for correctness." *Veysey v. Veysey*, 2014 UT App 264, ¶ 7, 339 P.3d 131 (quotation simplified).[4]

---

3. Again, we are puzzled. Our review of the record suggests that there was no show cause hearing before the district court.

4. Melvin also argues the district court denied him "the right to adequate notice and a fair hearing on the issues he presented" by dismissing the Counter-petition. This issue was not preserved for appeal. To preserve an issue for appeal, a party must

(continued…)

¶25    Janette cross-appeals, raising two issues. First, she argues "the district court erred in denying portions of [the Show Cause Motion]" by misinterpreting and misapplying the Decree. "An order relating to contempt of court is a matter that rests within the sound discretion of the district court." *Wolferts v. Wolferts*, 2013 UT App 235, ¶ 8, 315 P.3d 448 (quotation simplified). "In the absence of any action by the [district] court which is so unreasonable as to be classified as capricious and arbitrary, or a clear abuse of discretion, we will not overturn the [district] court's order." *Dansie v. Dansie*, 1999 UT App 92, ¶ 6, 977 P.2d 539 (quotation simplified). "We review the district court's findings of fact for clear error and its legal determinations for correctness." *LD III LLC v. Davis*, 2016 UT App 206, ¶ 12, 385 P.3d 689 (quotation simplified).

---

(…continued)

specifically and timely raise the issue before the district court and "introduce supporting evidence or relevant legal authority." *O'Dea v. Olea*, 2009 UT 46, ¶ 18, 217 P.3d 704 (quotation simplified). A review of the record reveals that Melvin did not present his due process argument to the district court, and therefore the court "did not have the opportunity to give full consideration to the issue[] at that time." *See id.* ¶ 19. Further, Melvin's principal appellate brief does not assert an exception to the preservation rule, and only in his reply brief does he argue "the [district] court committed plain error and the circumstances are exceptional." Because Melvin has "not argued an exception to our preservation requirement to persuade us to reach" this issue, we do not consider it further. *See True v. Utah Dep't of Transp.*, 2018 UT App 86, ¶ 22, 427 P.3d 338; *see also Marcroft v. Labor Comm'n*, 2015 UT App 174, ¶ 4, 356 P.3d 164 ("[W]e have consistently refused to consider arguments of plain error raised for the first time in an appellant's reply brief, even if the plain error argument is in response to a dispute over preservation raised for the first time in the appellee's brief." (quotation simplified)).

¶26    Second, Janette argues the district court erred in awarding her only $9,480 in attorney fees. "We review a [district] court's decision regarding attorney fees in a divorce proceeding for an abuse of discretion." *Jensen v. Jensen*, 2008 UT App 392, ¶ 8, 197 P.3d 117.


ANALYSIS

I. Alimony

¶27    Melvin argues his alimony obligation automatically terminated upon Janette's remarriage because the Decree did not "specifically provide otherwise." *See* Utah Code Ann. § 30-3-5(9) (LexisNexis Supp. 2018). We disagree.

¶28    "Alimony is presumed to terminate upon the remarriage of the receiving spouse." *Johnson v. Johnson*, 855 P.2d 250, 252 (Utah Ct. App. 1993). Utah courts have long recognized this presumption, *see, e.g.*, *Austad v. Austad*, 269 P.2d 284, 290 (Utah 1954) ("[T]here is implicit in the divorce decree the provision that the alimony continues only so long as the [receiving spouse] remains unmarried."), and it is now codified in Utah Code section 30-3-5(9). That provision provides, "Unless a decree of divorce specifically provides otherwise, any order of the court that a party pay alimony to a former spouse automatically terminates upon the remarriage or death of that former spouse." Utah Code Ann. § 30-3-5(9).

¶29    Here, the Decree was entered by default "pursuant to the terms set forth in" Melvin and Janette's "mediated stipulation for divorce." "[I]n the context of a divorce, parties are generally bound by their stipulations." *Thayer v. Thayer*, 2016 UT App 146, ¶ 17, 378 P.3d 1232. "Accordingly, we interpret [the Decree] according to established rules of contract interpretation." *Id.* (quotation simplified). "The underlying purpose in interpreting a contract is to ascertain the intentions of the parties to the

contract." *Id*. (quotation simplified). To do that, "we look to the plain meaning of the contractual language, and we consider each contract provision in relation to all of the others, with a view toward giving effect to all and ignoring none." *Id*. (quotation simplified).

¶30    The Decree does not identify Janette's remarriage as an event that will terminate Melvin's obligation to pay alimony. Instead, paragraph 10 orders Melvin to make alimony payments "until the first of any of the following occurrences: [Melvin's] death; [t]he expiration of 372 months from the signing of the [Decree]; or [Janette's] death." As Janette notes in her brief, "'the specification of terms in a contract implies the exclusion of all not expressed.'" (Quoting 17A C.J.S. *Contracts* § 415.) And absent the statute, we would infer that the parties intended alimony to survive Janette's remarriage based on their decision to omit remarriage from paragraph 10's list of terminating events. *See Martin v. Rasmussen*, 2014 UT App 200, ¶ 18, 334 P.3d 507 ("This court will not rewrite a contract to supply terms which the parties omitted." (quotation simplified)). But our precedent establishes that paragraph 10, without more, does "not provide for an exception to the general rule." *See Lord v. Shaw*, 682 P.2d 853, 855 (Utah 1984) (determining that a divorce decree stating "alimony is to run for a period of three years" did "not provide for an exception to the general rule that alimony terminates upon remarriage"), *disavowed on other grounds by Bailey v. Sound Lab, Inc.*, 694 P.2d 1043 (Utah 1984); *see also Eames v. Eames*, 735 P.2d 395, 398–99 (Utah Ct. App. 1987) (Orme, J., dissenting in part) (rejecting the "frivolous" argument that language in a divorce decree providing "alimony would continue until [the receiving party] reached 65" without referring to "earlier termination upon . . . remarriage" "might be deemed to mean the decree had 'specifically provided otherwise' and required alimony to be paid until age 65 regardless of whether [the receiving party] remarried" (quotation simplified)).

¶31 Nevertheless, our analysis must consider paragraph 10 "in relation to" each of the Decree's other provisions, "with a view toward giving effect to all and ignoring none." *See Thayer*, 2016 UT App 146, ¶ 17 (quotation simplified). And based on our review of the Decree "as a whole," we conclude that its language specifically provides that alimony would survive Janette's remarriage. *See id.* For example, paragraphs 19 and 28 state that certain payments—the car allowance and various expenses related to the marital house—would terminate upon Janette's remarriage. These provisions strengthen an inference that the parties intentionally omitted remarriage from paragraph 10.

¶32 We also find it significant that paragraph 10 includes Janette's death as a terminating event. The statute creates a presumption that alimony "terminates upon the remarriage *or death*" of the receiving spouse. Utah Code Ann. § 30-3-5(9) (emphasis added). If the parties intended alimony to terminate either upon Janette's death or remarriage, the reasonable action would have been to allow the statute to govern either event or include them both in paragraph 10. Indeed, listing Janette's death as a terminating event would have been unnecessary under those circumstances, and it seems the parties' decision to do so would be rendered meaningless if we were to conclude that alimony also terminated upon Janette's remarriage. The rules of contract interpretation dictate that we avoid such a result. *See Fisher v. Davidhizar*, 2018 UT App 153, ¶ 16, 436 P.3d 123 ("In interpreting a contract, . . . we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless." (quotation simplified)).

¶33 Further, footnote 4 orders Melvin and Janette to meet every three years—without spouses—"to review their respective standard of living" and potentially adjust alimony upward to comply with the order that "the standard of living . . . be equal." (Emphasis added.) The same footnote prohibits Janette and Melvin from "sharing any documentation or making any disclosure regarding the [parties' stipulation] with *future*

*spouses*,[5] [or] spouses' children." (Emphasis added.) We cannot ignore this provision, which orders the parties to discuss and potentially adjust alimony even after Janette's potential remarriage.

¶34  Melvin attempts to diminish footnote 4's significance by claiming our interpretation "requires [us] to assume that one of the spouses would be [Janette's] spouse." That is, he asserts "it is equally logical that over a period of more than thirty years [Melvin] might remarry more than once and thus have [multiple] spouses who would be excluded from the meeting or from knowledge of the negotiations." This argument is not well taken. Although Melvin possibly could have a *current* spouse as well as multiple *former* spouses at the time of the triennial review, we do not assume that the parties anticipated Melvin having multiple spouses at the same time. Instead, the only reasonable interpretation of this provision establishes that the spouse of each party who is married at the time of the review is prohibited from attending. And because footnote 4 contemplates the parties discussing alimony during the triennial review, it shows a clear intent that those payments would not terminate upon Janette's remarriage. Moreover, any other interpretation would render this provision meaningless.

¶35  As outlined above, *see supra* ¶ 7, the Decree is replete with references to future spouses. The Decree's provisions delineate obligations, but they expressly exclude a future spouse or that spouse's children. Janette is allowed to designate a beneficiary for a required annuity, but she expressly may not designate a future spouse or that spouse's children. The requirement for Melvin to pay off the marital house's mortgage continues even if Janette remarries. Finally, the Decree prohibits divestiture of assets or the disclosure of the terms of the Decree to a future

---

5. "Spouse" is defined as "[o]ne's husband or wife by lawful marriage." *Spouse*, Black's Law Dictionary 1533 (9th ed. 2009).

spouse. These provisions lead us to conclude that the parties considered Janette's potential remarriage and specifically agreed on how that event would affect their respective rights and obligations under the Decree. Accordingly, the only "reasonable" interpretation of the Decree as a whole is that alimony terminates only as expressly provided in paragraph 10. *See Peirce v. Peirce*, 2000 UT 7, ¶ 19, 994 P.2d 193 ("[W]e interpret the terms of a contract in light of the *reasonable* expectations of the parties, looking to the agreement as a whole and to the circumstances, nature, and purpose of the contract." (emphasis added)).

¶36     Therefore, we conclude that Melvin's alimony obligation did not automatically terminate upon Janette's remarriage, because the Decree "specifically provides otherwise," Utah Code Ann. § 30-3-5(9), and we affirm the district court's dismissal of Melvin's petition to terminate alimony.

## II. Show Cause Motion

¶37     The Show Cause Motion asked the district court to hold Melvin in contempt of court for not complying with various provisions of the Decree. Janette argues the court "erred in denying portions of [the Show Cause Motion] because it failed to interpret and give the terms of the Decree the effect the plain language called for."

¶38     "Disobedience of any lawful judgment or order of the court is contempt of the authority of the court." *Clarke v. Clarke*, 2012 UT App 328, ¶ 24, 292 P.3d 76 (quotation simplified); *see also* Utah Code Ann. § 78B-6-301(5) (LexisNexis 2018). To "prove contempt for failure to comply with a court order it must be shown that the person cited for contempt knew what was required, had the ability to comply, and intentionally failed or refused to do so." *Clark*, 2012 UT App 328, ¶ 24 (quotation simplified). "Once the court finds a person in contempt, it may then elect to impose an appropriate sanction." *Gardner v.*

*Gardner*, 2012 UT App 374, ¶ 32, 294 P.3d 600. An appropriate sanction may include monetary damages "if an actual loss or injury to a party in an action is caused by the contempt." *In re Cannatella*, 2006 UT App 89, ¶ 7, 132 P.3d 684 (quotation simplified).

¶39    "The rule of damages in a contempt case is the same as if the party were being proceeded against directly on the underlying obligation." *Bradshaw v. Kershaw*, 627 P.2d 528, 532 (Utah 1981). The court's order should seek to compensate the aggrieved party for the "actual loss or injury" caused by the contempt. Utah Code Ann. § 78B-6-311(1) (allowing courts to "order the person proceeded against to pay the party aggrieved a sum of money sufficient to indemnify and satisfy the aggrieved party's costs and expenses"); *see also Goggin v. Goggin*, 2013 UT 16, ¶ 37, 299 P.3d 1079 ("Because these awards compensated [the aggrieved party] for the actual loss or injury that [the contempt] caused, they were proper under the Contempt Statute." (quotation simplified)). Further, the court's calculation of damages should be supported by evidence of the aggrieved party's loss. *See Valerios Corp. v. Macias*, 2015 UT App 4, ¶ 24, 342 P.3d 1127 (explaining that the evidence must "provide a reasonable, even though not necessarily precise, estimate of damages" (quotation simplified)).

¶40    Janette raises four issues regarding the Show Cause Motion. First, she challenges the court's conclusion that Melvin was not required "to pay [her] out of pocket medical expenses." Second, she claims the court erred in determining that the yearly cost of living increase to Melvin's alimony obligation "could be less than 3%." Third, she contends the court provided Melvin with a "windfall" by not requiring him to purchase an annuity that complied with "the terms of the annuity [he] was obligated to purchase" and by awarding him credit against the annuity judgment to which he was not entitled. Fourth, she argues the court erred in determining "Melvin satisfied his obligation to pay [her] half of his 401(k)." We address each argument in turn.

A.      Out-of-Pocket Medical Costs

¶41    In the Show Cause Motion, Janette moved the district court to hold Melvin in contempt for refusing to "pay for all of [her] uncovered medical expenses." The court denied her motion after determining the Decree did not require Melvin to make any such payment. Janette argues the court's decision was "contrary to the Decree's plain and unambiguous language." We disagree.

¶42    "We interpret a divorce decree according to established rules of contract interpretation." *Moon v. Moon*, 1999 UT App 12, ¶ 18, 973 P.2d 431 (quotation simplified). "The underlying purpose in interpreting a contract is to ascertain the intentions of the parties to the contract. To ascertain the parties' intentions, we look to the plain meaning of the contractual language, and we consider each contract provision in relation to all of the others." *Thayer v. Thayer*, 2016 UT App 146, ¶ 17, 378 P.3d 1232 (quotation simplified).

¶43    A review of the Decree "as a whole" leads us to conclude that Melvin was not required to pay for Janette's personal out-of-pocket medical costs. Paragraph 7 of the Decree orders Melvin to employ Janette with one of his companies and requires that company to "pay for [her] health insurance premiums for so long as [she] requires medical insurance." Paragraph 7 does not state that Melvin must pay any of Janette's out-of-pocket costs. In contrast, paragraph 6 orders Melvin to "maintain medical insurance for the medical expenses of the [parties'] minor child . . . through [his] employment" and "pay for the minor child's *out-of-pocket costs* of the premium for the child's portion of the insurance." (Emphasis added.) Paragraph 6 also requires Melvin to "pay for the minor child's reasonable and necessary *uninsured medical expenses*, including deductibles and co-payments, incurred for the parties' minor child." (Emphasis added.) Under sub-paragraph 6(a), Janette must provide Melvin with written verification of any

medical expenses "[she] incurs *on behalf of the minor child . . .* within 30 days of payment" or make arrangements "so that [Melvin] may be billed directly." Janette's argument relies on sub-paragraph 7(b), which provides that "[t]he payment of [Janette's] health insurance premiums and *uncovered medical expenses* constitute a portion of the property settlement." (Emphasis added.)

¶44   Because the Decree includes the child's out-of-pocket costs in paragraph 6 and omits Janette's out-of-pocket costs from paragraph 7, it seems the parties intended that Melvin be responsible only for the out-of-pocket medical expenses incurred for the child's benefit—not those incurred for the benefit of Janette. *See Fisher v. Davidhizar*, 2018 UT App 153, ¶ 16, 436 P.3d 123 (explaining that "we look for a reading that harmonizes the provisions and avoids rendering any provision meaningless" (quotation simplified)). If the parties intended to require Melvin to pay Janette's out-of-pocket medical costs, they would have expressed such intent in paragraph 7. *Pioneer Builders Co. of Nevada Inc. v. K D A Corp.*, 2018 UT App 206, ¶ 13, 437 P.3d 539 ("The cardinal rule in contract interpretation is to give effect to the intentions of the parties as they are expressed in the plain language of the agreement itself." (quotation simplified)). Sub-paragraph 7(b) does not alter the result. The only "uncovered medical expenses" the Decree orders Melvin to pay are those incurred on behalf of the child. Thus, we see no reason to conclude that Janette's personal out-of-pocket expenses were meant to be included among the expenses mentioned in sub-paragraph 7(b).

¶45   In sum, we reject Janette's argument that "the Decree's plain and unambiguous language" requires Melvin to pay Janette's own uncovered medical expenses. Accordingly, we affirm the district court's decision to deny Janette's motion to hold Melvin in contempt for refusing to pay for those costs.

B.      Annual Adjustments to Alimony

¶46     Janette argues the district court erred in determining that the yearly cost of living increase to Melvin's alimony obligation "could be less than 3%." We disagree. The Decree orders Melvin to pay alimony, "with a cost of living increase of *up to* 3% per annum (based upon the CPI, but never to be less than the present amount being paid)." (Emphasis added.) This unambiguous language does not support Janette's argument that the yearly increase must be at least 3%. *See Brady v. Park*, 2019 UT 16, ¶ 53, 445 P.3d 395 ("If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language." (quotation simplified)). That is, stating that the increase will be *up to* 3% leaves open the possibility that the increase may be lower than 3%. Janette argues that Exhibit C to the parties' stipulation shows that alimony was to increase at a fixed rate of 3% per year because the yearly payments for "Alimony/Child Support" listed on Exhibit C increase by 3% each year. But the Decree is clear. It sets a flexible standard for the yearly increase to allow the parties to "equalize" their respective standards of living. For example, footnote 4 allows the parties to "include an upward adjustment to alimony beyond the CPI." Thus, the amounts listed in Exhibit C are merely estimates.

¶47     In short, we see no support for Janette's contention that the yearly increase to alimony must be at least "a flat 3% per year." Accordingly, the court's "interpretation of the [Decree] was [not] erroneous as a matter of law," and Janette has therefore failed to "convince us that the [district] court committed error." *See Christensen v. Christensen*, 2018 UT App 53, ¶ 5, 420 P.3d 106 (quotation simplified).

C.      Melvin's Annuity Obligation

¶48     The Decree ordered Melvin to purchase Janette a $1,000,000 annuity within thirty-six months of the entry of the

Decree. It is undisputed that Melvin did not purchase the annuity within that period. Accordingly, the district court entered a judgment against Melvin "in an amount sufficient to compensate [Janette] for the loss of the stream of income, past and future, from the ordered annuity." The order allowed Melvin to "satisfy the judgment entered against him" by purchasing "an annuity which pays $6,728.63 per month for 140 months." The court also awarded Melvin "credit against the annuity judgment for payments he made to [Janette] for [her] benefit (that [she] would have otherwise been paying herself out of the stream of income from the annuity) past the date that the annuity should have been purchased."

¶49   Janette argues the court abused its discretion by not requiring Melvin to purchase an annuity that complied with "the terms of the annuity [he] was obligated to purchase" and by awarding him credit against the annuity judgment to which he was not entitled. This argument has merit. Because the evidence does not support the district court's order, *see Valerios Corp. v. Macias*, 2015 UT App 4, ¶ 24, 342 P.3d 1127 (explaining that the evidence must "provide a reasonable, even though not necessarily precise, estimate of damages" (quotation simplified)), and does not compensate Janette for the "actual loss or injury" that Melvin caused her by failing to timely purchase the annuity, *see* Utah Code Ann. § 78B-6-311(1) (LexisNexis 2018) (allowing courts to "order the person proceeded against to pay the party aggrieved a sum of money sufficient to indemnify and satisfy the aggrieved party's costs and expenses"), we conclude the court's ruling amounted to an abuse of discretion.

¶50   First, the evidence does not support the court's decision to award Melvin "credits toward the annuity price" for making the payments listed in sub-paragraphs 18(b)–(g) "past the date that the annuity should have been purchased." Sub-paragraphs 18(b)–(g) ordered Melvin to pay various expenses related to the marital house. But paragraph 21 states, "Upon [Melvin's]

purchase of the annuity . . . , [his] responsibility for the payments outlined in paragraph 18(b)–(g) is ordered to cease." Thus, Melvin was obligated to make the payments listed in sub-paragraph 18(b)–(g) *until* he purchased the annuity. Because it is undisputed that Melvin did not timely purchase the annuity, it follows that his obligation to make those payments did not "cease" at the time the annuity should have been purchased. Accordingly, we see no evidentiary basis for the court's decision to grant Melvin credit against the annuity judgment for payments made under sub-paragraphs 18(b)–(g) "past the date the annuity should have been purchased." And we conclude that doing so amounted to an abuse of discretion. *See Gardner v. Gardner*, 2012 UT App 374, ¶ 33, 294 P.3d 600 ("[A]ny award of damages must be based on something more than mere speculation.").

¶51 Second, we agree with Janette that the district court abused its discretion by allowing Melvin to satisfy the judgment against him by purchasing an annuity that (1) did not list Janette as the irrevocable beneficiary, (2) had a term fewer than fifteen years, (3) was less than the face value of the annuity he was obligated to purchase under the Decree, and (4) did not account for the loss in value Janette incurred by Melvin failing to purchase the annuity in a timely fashion. Although the court concluded Janette was entitled to "a judgment in an amount sufficient to compensate her for the loss of the stream of income, past and future, from the ordered annuity," its order allowed Melvin to satisfy that judgment without compensating Janette for the "actual loss or injury" that resulted from him not fulfilling his obligations under the Decree. *See* Utah Code Ann. § 78B-6-311(1).

¶52 The Decree ordered Melvin to purchase an annuity of $1,000,000 and required its "payout duration" to be "in excess of fifteen years." Further, Janette was to "be irrevocably designated as the beneficiary of the annuity during her lifetime with the power to designate any blood relative as the beneficiary of any

death benefit provided by the annuity." In direct conflict with those terms, the court's order allowed Melvin to "satisfy the judgment entered against him for the annuity" by purchasing "an annuity which pays $6,728.63 per month for 140 months"—a total of $942,008 paid over a period of less than twelve years. Further, the order did not satisfy the Decree's requirement that Janette "be irrevocably designated as the beneficiary of the annuity." Accordingly, we see no evidentiary basis for the court's order, and we agree with Janette that the court abused its discretion by allowing Melvin a "windfall as a result of his own breach." *See Valerios Corp.*, 2015 UT App 4, ¶ 24 (explaining that the evidence must "provide a reasonable, even though not necessarily precise, estimate of damages" (quotation simplified)).

¶53 Because we see no evidence supporting the court's calculation of damages for Melvin's failure to timely purchase the annuity, we conclude its actions amount to "a clear abuse of discretion." *Gardner*, 2012 UT App 374, ¶ 14 (quotation simplified). Accordingly, we reverse its order and remand for further proceedings. On remand, the court should enter a judgment against Melvin that adequately compensates Janette for the "actual loss or injury" caused by Melvin's failure to purchase the annuity within thirty-six months after the Decree was entered. *See* Utah Code Ann. § 78B-6-311(1).

D.     401(k)

¶54 Janette argues the district court erred in determining that Melvin had "satisfied his obligation to pay [Janette] half of his 401(k)." We are not persuaded.

¶55 The Decree awarded Janette "one-half of [Melvin's] 401(k) retirement benefits accrued during the parties' marriage." Paragraph 16 provided for an "appropriate Qualified Domestic

Relations Order[6] securing [Janette's] interest in said retirement plan," but Melvin was "ordered to try and have the account divided equally without the necessity of a QDRO." In its recommendation, the court commissioner found that "the payment of half of [Melvin's] 401(k) account ha[d] been satisfied . . . by [his] payment to [Janette] in the amount of $8,885.52." The district court approved the commissioner's determination.

¶56    Janette challenges the court's decision. She starts by claiming Melvin's "401(k) had a balance of $37,612.62" when the Decree was entered on November 21, 2008. According to Janette, Melvin "waited until February 20, 2009, to liquidate the account"—about three months after the Decree was entered—when "the account's balance had allegedly dropped from $37,612.62 to approximately $17,771.04." Janette then argues that because the Decree ordered Melvin to pay her one-half of the account's balance when the Decree was entered (which she claims was $18,803.31), she was entitled to "a judgment against [Melvin] in the amount of $9,922.79; i.e., the difference between the amount received and half of the account's balance when the Decree was entered."

¶57    Janette has failed "to carry [her] burden of persuasion on appeal." *See Bank of Am. v. Adamson*, 2017 UT 2, ¶ 12, 391 P.3d 196 (quotation simplified). First, the record does not support Janette's assertion that the 401(k)'s balance was $37,612.62 when the Decree was entered. Her brief cites an account summary for the period of October 1, 2008, through December 31, 2008, that lists a "total value" of $37,612.62 on October 1, 2008, and a "total value" of $28,904.27 on December 31, 2008. But because the

---

6. "A qualified domestic relations order [(QDRO)] instructs the trustee of a retirement plan and specifies how distributions should be made, to whom, and when." *Potts v. Potts*, 2018 UT App 169, ¶ 1 n.2, 436 P.3d 263 (quotation simplified).

Decree was not entered until November 28, 2008, the account summary does not reveal the account's balance at the time the Decree was entered. The account summary supports the district court's finding that the balance was declining because "the market had tanked," and it shows that the "total value" of the 401(k) when the Decree was entered was likely between $37,612.62 (value as of October 1) and $28,904.27 (value as of December 31). Further, the account summary divides the "total value" into two categories: "employee money" and "employer money." It states that the "employer account balance may not [have been] 100% vested" and "if [Melvin] terminate[d] employment, [he] might not [have] receive[d] all of the money [his] employer [had] contributed to the plan." The "employee money" was $28,173 on October 1, 2008, and $21,650.32 on December 31, 2008. Accordingly, the record shows that the amount of "employee money" in Melvin's 401(k) when the Decree was entered was between $21,650.32 and $28,173; not, as Janette claims, $37,612.62.

¶58  Second, Janette has not convinced us that the court abused its discretion in concluding that Melvin satisfied his obligation to pay her half of the 401(k) with the $8,885.52 payment. Below, Melvin argued that "due to the rapidly declining value of the mutual funds in which the 401(k) was invested, the parties agreed to try and divide the account equally without the necessity of a QDRO by liquidating the account." And he asserted that when the 401(k) was liquidated, "a direct deposit was made into [his] account in the amount of $18,421.13." He "paid the mandatory 10% penalty of $1,842 which yielded a balance of $8,289.52 each." Thus, Melvin claimed that he actually "over-paid Janette by $595.95" because she received $8,885.52 when "[her] one-half of the 401(k) was only $8,289.57."

¶59  The court commissioner accepted Melvin's argument, finding that Melvin "took the check that he got" for "the reduced value of the 401(k) after the market had tanked, divided that in

half, and gave half of the remaining value to [Janette]." The commissioner even found that Melvin paid "some taxes on—on the withdrawal, but those were not taken out of [Janette's] share." Based on those findings, the commissioner concluded that Janette had "been made whole by [Melvin] paying her [$8,885.52]." Janette has not shown that this conclusion was in error. As far as we can tell, Melvin complied with the Decree's order to divide the 401(k) equally between the parties by liquidating the account and paying Janette half of what he received.

¶60    We conclude that the court's order was not "so unreasonable as to be classified as capricious and arbitrary, or a clear abuse of discretion," *Dansie v. Dansie*, 1999 UT App 92, ¶ 6, 977 P.2d 539 (quotation simplified), and we affirm the court's determination that Melvin satisfied his obligation to pay Janette one-half of his 401(k) benefits accrued during the parties' marriage.

### III. Attorney Fees

¶61    Janette argues "the district court erred by arbitrarily reducing [her] attorney fee award." We disagree.

¶62    "Utah Code section 30-3-3(2) authorizes an award of costs and attorney fees 'in any action to enforce an order of custody, parent-time, child support, alimony, or division of property in a domestic case' upon the court's determination 'that the party substantially prevailed upon the claim or defense.'" *Wollsieffer v. Wollsieffer*, 2019 UT App 99, ¶ 13 (quoting Utah Code Ann. § 30-3-3(2) (LexisNexis Supp. 2018)). Fees awarded under section 30-3-3(2) "serve no equalizing function but allow the moving party to collect fees unnecessarily incurred due to the other party's recalcitrance." *Connell v. Connell*, 2010 UT App 139, ¶ 30, 233 P.3d 836. "In other words, when one party refuses to comply with a court order, thereby compelling another party to seek its enforcement, that party risks liability for the fees and costs

accrued in the enforcement proceeding." *Wollsieffer*, 2019 UT App 99, ¶ 13.

¶63    "Both the decision to award attorney fees and the amount of such fees are within the [district] court's sound discretion." *Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 10, 176 P.3d 476 (quotation simplified). But in fixing the amount of reasonable fees, the court should consider (1) the legal work "actually performed," (2) the amount of work that was "reasonably necessary to adequately prosecute the matter," (3) whether the attorney's billing rate is "consistent with the rates customarily charged in the locality for similar services," and (4) any "circumstances which require consideration of additional factors." *Dixie State Bank v. Bracken*, 764 P.2d 985, 990 (Utah 1988).

¶64    Here, the district court awarded Janette attorney fees "regarding her attempts to enforce the Decree's terms" and said, "While both parties prevailed on some issues and were less successful on others, [Janette] was the prevailing party in relation to the prosecution of [the Show Cause Motion]." The court explained further that the Show Cause Motion "brought up such quick decisions . . . [b]ecause [Melvin] was not in compliance with the [D]ecree." We see no abuse of discretion in the district court's decision to award attorney fees to Janette only for her efforts to prosecute the Show Cause Motion. *See Neff v. Neff*, 2011 UT 6, ¶¶ 70–71, 247 P.3d 380 (explaining that a court's "decision about who prevailed" should be "based on an approach that [is] flexible and reasoned" and highlighting "the importance of . . . common sense"). In prosecuting that motion, Janette successfully enforced the Decree by showing that Melvin failed to timely purchase the annuity. Thus, it was reasonable for the court to award her attorney fees "accrued in [that] enforcement proceeding." *See Wollsieffer*, 2019 UT App 99, ¶ 13.

¶65    Janette submitted an attorney fees affidavit detailing the fees she incurred in the case. The affidavit claimed "$275,659.00

was incurred in [her] efforts to enforce the terms of the [Decree]" and, of that amount, $61,448 was incurred in "the prosecution of [the Show Cause Motion]." Based on that affidavit, Janette filed a proposed order with an award of $275,659 in attorney fees. After the court rejected this amount, Janette requested an award of $61,448. But the court determined that those "fees [were] not reasonable for an [order to show cause] hearing before the commissioner and then the court." After reviewing Janette's attorney fees affidavit, the court determined $9,480 "incurred in fees was reasonable and necessary in relation to the prosecution of [the Show Cause Motion]" and entered an order reflecting that amount.

¶66 The district court's fees award does not constitute an abuse of discretion. Janette requested $61,448 in fees, but the record reveals that the court concluded such an amount was not "reasonably necessary to adequately prosecute" the Show Cause Motion. *See Dixie State Bank*, 764 P.2d at 990. We cannot say such a conclusion was "beyond the limits of reasonability." *See Strohm v. ClearOne Commc'ns, Inc.*, 2013 UT 21, ¶ 52, 308 P.3d 424 (quotation simplified). As the court explained, Janette prevailed on the Show Cause Motion because Melvin simply "was not in compliance with the Decree." Janette may believe that $9,480 is insufficient for her enforcement efforts, but "the amount itself does not prove that the trial court abused its discretion." *Prince v. Bear River Mutual Ins. Co.*, 2002 UT 68, ¶ 55, 56 P.3d 524. And although Janette argues that "this matter has been heavily contested and aggressively litigated by both parties," a district court "is in a better position than an appellate court to gauge the quality and efficiency of the representation and the complexity of the litigation." *Strohm*, 2013 UT 21, ¶ 52 (quotation simplified). Accordingly, we affirm the district court's award of attorney fees to Janette because we are not convinced that the award amounted to "patent error or clear abuse of discretion." *See Dixie State Bank*, 764 P.2d at 989 (quotation simplified).

¶67  We note, however, that our remand of the annuity issue may affect Janette's attorney fees award. As the prevailing party on the Show Cause Motion, Janette is entitled to fees on remand reasonably incurred enforcing the Decree's terms. Further, because Janette received attorney fees for enforcing the Decree below and she has substantially "prevailed on the main issues on appeal," she is entitled to attorney fees incurred for enforcing the Decree on appeal. *See Oliekan v. Oliekan*, 2006 UT App 405, ¶ 32, 147 P.3d 464 (quotation simplified). Accordingly, we direct the court to award Janette her fees incurred for that purpose on appeal and the fees she incurs for that purpose on remand.

CONCLUSION

¶68  We affirm the district court's determination that Melvin's alimony obligation continued after Janette's remarriage. But we conclude the court abused its discretion by entering a judgment against Melvin that failed to compensate Janette for the actual loss caused by his failure to timely purchase the annuity. And we affirm the court's award of attorney fees to Janette as the prevailing party on the Show Cause Motion. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. On remand, the district court should enter a judgment against Melvin that adequately compensates Janette for Melvin's failure to timely purchase the annuity. It should also award Janette her attorney fees incurred for enforcing the Decree on appeal and the fees she incurs for that purpose on remand.

_____